RECTOR v MICHIGAN SECURITY SYSTEMS, INC

Docket No. 78-581. Submitted December 13, 1978, at Detroit.—Decided May 22, 1979. In lieu of leave to appeal, reversed and remanded for new trial, 407 Mich 864.

Emily Rector brought a products liability action against Michigan Security Systems, Inc., for damages for personal injuries suffered by the plaintiff and arising out of the defendant's sale to the plaintiff of a burglar alarm system which failed to function properly. Multi-Elmac Company, the manufacturer of the alarm system in question, was added as a third-party defendant. Judgment of no cause of action, Oakland Circuit Court, Francis X. O'Brien, J. The plaintiff appeals. *Held:*

The plaintiff produced some evidence of some defect in the sending unit of the system, the specific nature of which is unclear. However, there was no evidence introduced that would allow one to infer that any of the possible defects was attributable to the defendant. The case should not have gone to the jury because the plaintiff did not sustain her burden of introducing evidence from which the jury could reasonably infer that any defect in the sender existed at the time it left the defendant's control.

Affirmed.

N. J. KAUFMAN, J., dissented. Sufficient evidence was presented so that it would not have been unreasonable for a jury to infer that the transmitter failure was probably due to a defect attributable to the defendant. The case was properly submitted to the jury. However, he would have no difficulty in affirming the verdict of no cause of action, had the jury been properly instructed. The trial court submitted special questions to the jury, one of which called for a specific identification of the problem with the transmitter. The plaintiff objected to this

REFERENCES FOR POINTS IN HEADNOTES

[1, 4, 5] 63 Am Jur 2d, Products Liability §§ 129, 134, 135.

Products liability: strict liability in tort. 13 ALR3d 1057.

Products liability: proof under strict tort liability doctrine, that defect was present when product left hands of defendant. 54 ALR3d 1079.

[2, 6-8] 63 Am Jur 2d, Products Liability § 22.

[3] 76 Am Jur 2d, Trial §§ 1182, 1183.

question arguing that a specific demonstrable defect did not have to be shown. The answers to the special questions do not appear in the record making it impossible to determine the basis for the jury's verdict. The jury may have concluded that plaintiff had no cause of action due to the question which erroneously called for specific identification of the problem with the transmitter.

Judge KAUFMAN would reverse the judgment and remand for a new trial.

OPINION OF THE COURT

1. PRODUCTS LIABILITY — SALE OF DEFECTIVE PRODUCT — EVIDENCE — BURDEN OF PROOF — CAUSE OF INJURY.

A plaintiff seeking to hold a defendant liable for personal injuries or damages caused by the sale of a defective product has the burden of producing evidence of a defect in the product which caused the injury or damage, whether the action sounds in warranty or negligence.

2. PRODUCTS LIABILITY — EVIDENCE — CIRCUMSTANTIAL EVIDENCE — DEMONSTRABLE DEFECT.

The conclusion, in a products liability case, that a product was defective may be drawn from circumstantial evidence without a specific showing of a demonstrable defect.

3. EVIDENCE — SUFFICIENCY OF EVIDENCE — JURY — APPEAL AND ERROR — LIGHT MOST FAVORABLE TO PLAINTIFF — TRIER OF FACT.

The Court of Appeals, when ruling on the issue of whether or not a plaintiff has presented sufficient evidence to submit a case to the jury, must view the evidence presented in a light most favorable to the plaintiff; if there is any competent evidence sufficient to support a verdict for plaintiff, the Court of Appeals may not interfere with the province of the trier of fact.

4. PRODUCTS LIABILITY — EVIDENCE — SUFFICIENCY OF EVIDENCE — JURY — DEFECT ATTRIBUTABLE TO MANUFACTURER — BURDEN OF PROOF.

A products liability action against the manufacturer of a burglar alarm system should not have been submitted to the jury where the plaintiff did not sustain her burden of introducing evidence from which the jury could infer that any of the possible defects was attributable to the defendant or could reasonably infer that any defect in the product existed at the time it left the defendant's control.

Dissent by Kaufman, J.

5. PRODUCTS LIABILITY — DEFECT — CAUSAL CONNECTION TO INJURY — BURDEN OF PROOF.

*A plaintiff must prove a defect in a product attributable to a manufacturer and a causal connection between the defect and the injury or damage complained of in order to recover damages from the manufacturer in a products liability action.*

6. PRODUCTS LIABILITY — EVIDENCE — DIRECT EVIDENCE — CIRCUMSTANTIAL EVIDENCE — DEFECTS.

*A plaintiff in a products liability action may rely on direct or circumstantial evidence in proving the existence of a defect attributable to the manufacturer or seller of the product.*

7. PRODUCTS LIABILITY — POSSIBLE CAUSES OF PRODUCT'S FAILURE — BURDEN OF PROOF — DEFECT ATTRIBUTABLE TO MANUFACTURER OR SELLER.

*A plaintiff in a products liability case is not required to eliminate all possible causes of a product's failure consistent with the view that there was no manufacturing defect and is not necessarily required to prove a particular malfunction; the plaintiff sustains his burden when he establishes by direct or circumstantial evidence a reasonable probability that the defect, whatever it may be, is attributable to a defendant manufacturer or seller.*

8. PRODUCTS LIABILITY — EVIDENCE — JURY — DEFECT — REASONABLE INFERENCES — TRIER OF FACT.

*A plaintiff in a products liability case who has presented evidence, direct or circumstantial, from which it is reasonable to infer that an accident was probably caused by a defect attributable to the manufacturer has made out a case for the jury, and the question whether the inference suggested by the plaintiff's theory is the correct one, or whether it was sufficiently rebutted, is for the jury.*

*Lopatin, Miller, Bindes, Freedman & Bluestone* (by *Michael Gagleard),* for plaintiff.

*Dice, Sweeney, Sullivan & Feikens, P.C.,* for defendant.

*Plunkett, Cooney, Rutt, Watters, Stanczyk &*

*Pedersen* (by *Joseph Walker* and *Christine D. Oldani),* for third-party defendant.

Before: Danhof, C.J., and D. C. Riley and N. J. Kaufman, JJ.

Danhof, C.J. Plaintiff Emily Rector appeals from a jury verdict of no cause of action in a products liability suit arising out of defendant's sale to plaintiff of a burglar alarm system. We find it unnecessary to address the issue she raises because we conclude that she presented insufficient evidence to support a reasonable inference that the product contained a defect attributable to defendant. The case should therefore not have been submitted to the jury for decision.

Plaintiff's proofs at trial were as follows. Plaintiff was a widow living alone in a neighborhood of Detroit which had recently been the scene of several burglaries and muggings. Since her job often caused her to return home later in the evenings, she became apprehensive about her safety. In February, 1971, plaintiff purchased a burglar alarm system for her home from defendant Michigan Security Systems, Inc. Having explained her concerns to Clem Campbell, defendant's sales representative, and relying upon his recommendation, she also purchased a remote control panic sender device. This consisted of a small, hand-held unit with a push button which, when pressed within a limited range of plaintiff's home, would transmit a radio signal activating a receiver in her attic. The receiver would then trigger a very loud siren and a flashing light on her roof.

Defendant installed the system in plaintiff's home in March, 1971. Both plaintiff and defendant tested the system, including the sender device, and found it in satisfactory working order. However,

the alarm did go off, apparently without cause, on at least one occasion two or three months after its installation. One of defendant's installers checked the system the next day, but found nothing amiss. The installer surmised to plaintiff at the time that another object emitting stray radio frequency signals (e.g., a garage door opener, ham radio or a police car radio) might have triggered the alarm, but he otherwise deemed the system to be functioning properly.

Plaintiff experienced no further problems until November 18, 1971. She pulled into her driveway at 9:45 p.m., took the sender in hand, and then, upon opening her car door, sensed someone's presence. Plaintiff immediately pressed the button on the sender, but the alarm system failed to function. As she continued to futilely press the button, she was dragged from her car and thrown to the ground. Her two assailants escaped with her purse. Plaintiff also sustained a seriously fractured ankle, requiring surgery, and has since suffered numerous complications. One of plaintiff's neighbors verified that the alarm system had been turned on that day.

Joseph Matcher, a technician employed by Multi-Elmac Company, the manufacturer of plaintiff's sender and third-party defendant in this case, testified that he had put his initials on a repair invoice indicating that plaintiff's sender had been repaired on December 2, 1971. Clem Campbell, defendant's sales representative, stated that both plaintiff's sender and receiver had been replaced after November 18, 1971, and that he did not know what happened to the replaced sender. He also testified that he had tested the sender in plaintiff's home after November 18, that it did not function at that time, and that Multi-Elmac had

subsequently reported that the sender was "out of frequency".

Phil Latona, the installer of plaintiff's system, testified that he had never tested the sender in plaintiff's car. He also admitted that he was not very familiar with the internal mechanism of the sender. Although he could tell whether it was functioning or not, he could not fully test it after installation to determine whether potential or latent defects existed. Plaintiff rested her case.

While plaintiff has the burden of proof to establish a defect attributable to defendant, we will also take into account the testimony offered by third-party defendant Multi-Elmac which, in certain respects, plaintiff relied on to establish her prima facie case. Joseph Matcher, Multi-Elmac's repair technician, was recalled to testify regarding the repairs he had performed on plaintiff's sender.[1] Based on the notations he had made in his repair invoice, he stated that he had found no workmanship defect. He had done a slight tuning adjustment to bring the sender closer to the standard frequency specification. But again according to the invoice, he testified that the sender was probably within frequency specifications because he would normally have noted any need for major adjustment. Matcher then stated that he had marked a column on the invoice entitled "component failure", and that the notation might have referred to a defective battery in the sender. Matcher also testified that he had replaced the push button on the unit, but did not know whether the replacement was for esthetic reasons (e.g., worn or dirty appearance) or because it was defective.

---

[1] Matcher testified that, at the time he made the repairs on plaintiff's sender, he was unaware of the circumstances under which it had failed to function. Neither did he know that a lawsuit would later be filed on the basis of alleged defects in the sender.

Finally, Peter Wallen, an electronics engineer from Multi-Elmac, testified extensively as to various factors affecting the functional capacity of the sender and receiver. He stated that atmospheric changes, other objects emitting radio signals, the metal of a car dashboard, the tinted glass of a car windshield and abusive treatment of the sender could all result in or contribute to desensitizing the receiver or interfering with the transmitting capacity of the sender. In his opinion, the sender must have been functioning correctly when it left the manufacturer or it would not have worked properly for eight months thereafter.

Plaintiff submitted her case to the jury on the theories of defendant's negligence and of defendant's breach of an implied warranty of reasonable fitness for the purpose intended. Under either theory, plaintiff must initially prove a defect attributable to the defendant. *Piercefield v Remington Arms Co, Inc,* 375 Mich 85, 98-99; 133 NW2d 129 (1965), *Snider v Bob Thibodeau Ford, Inc,* 42 Mich App 708, 713; 202 NW2d 727 (1972), *Caldwell v Fox,* 394 Mich 401, 410; 231 NW2d 46 (1975).

Although the proofs suggest a number of possible causes for malfunction of the sender, plaintiff never sought to pinpoint the specific nature of the alleged defect. This is, however, not necessarily fatal to her case if one could reasonably infer from circumstantial evidence that a defect did exist. See *Kujawski v Cohen,* 56 Mich App 533; 224 NW2d 908 (1974), *Bronson v J L Hudson Co,* 376 Mich 98; 135 NW2d 388 (1965), *Piper v Tensor Corp,* 71 Mich App 658; 248 NW2d 659 (1976), *Garmo v General Motors Corp,* 45 Mich App 703; 207 NW2d 146 (1973).

We also preliminarily note that we must view the evidence in the light most favorable to the

plaintiff. If there is any competent evidence sufficient to support a verdict for plaintiff, we may not interfere with the province of the trier of fact. See *Kujawski, supra,* at 535-538. The comparative probability or plausibility of competing theories is not for this Court or a trial court to decide. *Holloway v General Motors Corp (On Rehearing),* 403 Mich 614; 271 NW2d 777 (1978), *rev'g* 399 Mich 617; 250 NW2d 736 (1977).

Plaintiff sufficiently established that the sender malfunctioned on the date of her injury, and that it was still nonfunctional when defendant's employees later checked the alarm system at her home. Proofs were also adduced that thereafter her alarm system only operated properly by remote control when the sender was replaced, that both the battery and the push button of plaintiff's sender were replaced, and that the sender required adjustment to frequency specifications after the initial date of malfunction. Although the nature of the specific defect is not clear, one may reasonably infer that either one cause alone, or a combination of causes, rendered the plaintiff's sender defective on November 18, 1971.

However, one cannot reasonably infer that any of the aforementioned possible defects is attributable to defendant. Plaintiff stated that the alarm system, including the sender, worked properly from the date of installation until the date of her injury, a period of some eight months. The one possible exception was a false alarm about two or three months after installation. But the only explanation offered was that a stray radio signal had activated the receiver. Plaintiff made no showing that the receiver was defective then or on November 18, 1971. If anything, the false alarm seems to attest to the sensitivity of the receiver. In addition,

this incident cannot be linked to the operation or malfunction of the sender and is thus not probative of any existing defect in that unit. Compare, *Snider, supra, Piper, supra,* and *Garmo, supra,* in which a history of repairs to or of difficulties with the alleged defective part aided in establishing a link between defendant and the defect.

If the sender functioned appropriately for eight months without evidence of defect, one must then be able to reasonably infer that the defect or defects revealed by the later malfunction were latent in the product at the time the defendant sold it to plaintiff. See *Holloway, supra.* The mere fact of malfunction does not give rise to any necessary inference as to when the defect arose.

Third-party defendant's repair technician testified that the sender's battery and push button were replaced, and that he adjusted the unit to meet frequency specifications. Batteries are not components which one would expect to function indefinitely. They are subject to wear, must be replaced periodically, and are not evidence of a latent defect attributable to defendant. As for the push button, it was unclear whether the part was replaced because it was actually defective or merely worn in appearance. While one might reasonably infer that it was broken at the time of repair, there is no showing as to why, how or when the push button might have been damaged. The connection between a possibly defective push button in December, 1971, the cause of which defect in any case remains unknown, and the existence of a defect in March, 1971, attributable to defendant is tenuous in the extreme.[2] See *Kup-*

[2] Plaintiff argued below that the push button might possibly have been broken when she, in her panic, pressed it hard and repeatedly in an attempt to activate the alarm system. Plaintiff further contended that this theory would support a conclusion of lack of reasonable

*kowski v Avis Ford, Inc,* 395 Mich 155; 235 NW2d 324 (1975), *aff'g* 51 Mich App 668; 215 NW2d 767 (1974).

Neither will the tuning of the sender to meet frequency specifications support a finding of a defect attributable to defendant. The repair technician testified that he most probably only made a slight tuning adjustment to meet more closely the standard sender frequency specifications and that the sender was probably within the appropriate frequency range because he would have noted any necessity for major adjustment on the repair invoice. It is of course possible to infer that the sender was sufficiently "out of frequency" to malfunction on the date of plaintiff's injury or that the variance from standard frequency contributed to the failure of the alarm system. But again, any further inference as to the existence of such a defect in March, 1971, is purely speculative and not supported by proofs at trial. See *Meli v General Motors Corp,* 37 Mich App 514; 195 NW2d 85 (1972).

Regarding other reasons offered by Multi-Elmac's expert witness for malfunction of the sender, including atmospheric variations and other types of interference with transmission of the signal, they were simply conjectural and not shown to be linked to the particular malfunction of plaintiff's sender. We conclude from the above analysis that plaintiff did not sustain her burden of introducing evidence from which the jury could reasonably infer that any defect in the sender existed at the time it left defendant's control.

Affirmed. Costs to defendant.

---

fitness of the product for the purpose intended. While we concede the theoretical possibility of plaintiff's contention, we nevertheless emphasize that one must speculate on the basis of an inference to even reach a conclusion as to the cause of any damage to the push button.

D. C. RILEY, J., concurred.

N. J. KAUFMAN, J., *(dissenting)*. I agree with the majority's recitation of the facts; however, in light of the recent Michigan case law on products liability, I must dissent. While there is some confusion in Michigan as to the proper designation of products liability claims,[1] there is no doubt that we recognize the existence of an implied warranty of fitness for a particular purpose. MCL 440.2315; MSA 19.2315; *Holloway v General Motors Corp (On Rehearing),* 403 Mich 614; 271 NW2d 777 (1978) (hereinafter *Holloway II), Holloway v General Motors Corp,* 399 Mich 617; 250 NW2d 736 (1977) (hereinafter *Holloway I),* and see MCL 440.2314; MSA 19.2314 and *Piercefield v Remington Arms Co, Inc,* 375 Mich 85; 133 NW2d 129 (1965).

To recover under the theory, plaintiff must prove a defect attributable to the manufacturer and a causal connection between that defect and the injury or damage of which she complains.[2] *Holloway I, supra,* 624-625, *Kupkowski v Avis Ford, Inc,* 395 Mich 155, 160-161; 235 NW2d 324 (1975), *Caldwell v Fox,* 394 Mich 401, 410; 231 NW2d 46 (1975), *Piercefield, supra,* 98-99. This

---

[1] I will not get into a lengthy discussion regarding the difference, real or imagined, in Michigan between strict liability in tort and breach of implied warranty of fitness for a particular purpose. For representative discussions on this question, see *Johnson v Chrysler Corp,* 74 Mich App 532, 535-536; 254 NW2d 569 (1977), and *Dooms v Stewart Bolling & Co,* 68 Mich App 5, 10-16; 241 NW2d 738 (1976). See also Prosser, Law of Torts, pp 650-658, 671-672 (4th ed 1971); Prosser, *The Fall of the Citadel (Strict Liability to the Consumer),* 50 Minn L Rev 791, 800-805 (1966); Prosser, *The Assault Upon the Citadel (Strict Liability to the Consumer),* 69 Yale L J, 1099, 1133-1134 (1960); 2 Frumer and Friedman, Products Liability, ch 3 (1978). I leave that issue to the Michigan Supreme Court and limit my dissent to the theory of implied warranty for a particular purpose.

[2] The focus of the instant case is on the first part of the implied warranty theory: proof that there is a product defect attributable to the defendant.

doctrine was extended to sellers of defective goods in *Bronson v J L Hudson Co,* 376 Mich 98; 135 NW2d 388 (1965).

In proving the existence of a defect attributable to the manufacturer or seller, a plaintiff may rely on direct or circumstantial evidence. *Holloway II, supra,* 618, 619, and see *Schedlbauer v Chris-Craft Corp,* 381 Mich 217; 160 NW2d 889 (1968), *Bronson, supra.* However, a plaintiff is not required to eliminate all possible causes of the product failure consistent with the view that there was no manufacturing defect. And a plaintiff is not necessarily required to prove a particular malfunction. She sustains her burden when she establishes by direct or circumstantial evidence a reasonable probability that the defect, whatever it may be, is attributable to the defendant manufacturer or seller. *Holloway, II, supra,* 618, 621, 626-629, *Snider v Bob Thibodeau Ford, Inc,* 42 Mich App 708, 713-716; 202 NW2d 727 (1972).

The majority indicates that the case should not have been submitted to the jury because plaintiff presented insufficient evidence to support an inference that the product contained a defect attributable to the defendant. However, as explained in *Holloway II, supra,* 622:

"On a motion for directed verdict, the question is whether it is reasonable to infer from the evidence, direct or circumstantial, that the accident was probably caused by a defect attributable to the manufacturer. Questions of comparative probability are to be resolved by the trier of fact. As stated in *Schoepper v Hancock Chemical Co,* 113 Mich 582, 586, 589; 71 NW 1081 (1897), and since reaffirmed in *Schedlbauer v Chris-Craft Corp,* 381 Mich 217, 230-231; 160 NW2d 889 (1968):

" 'It is true that where an injury occurs that cannot be accounted for and where the occasion of it rests

wholly in conjecture, the case may fail for want of proof. * * * But such cases are rare, and that rule should never be so extended as to result in a failure of justice, or in denying an injured person a right of action where there is room for balancing the probabilities, and for drawing reasonable inferences better supported upon one side than upon the other. * * * *[T]he question of whether the inference suggested by the plaintiff's theory is the correct one, or whether it was sufficiently rebutted, was for the jury.'* (Emphasis supplied.)" (Footnotes omitted.)

As also stated in *Smith v E R Squibb & Sons, Inc,* 405 Mich 79, 89; 273 NW2d 476 (1979):

"The distinction between the elements of negligence and breach of implied warranty is that in the former plaintiff must prove that the defect was caused by the manufacturer's negligence, whereas under the warranty theory, plaintiff need only establish that the defect was attributable to the manufacturer, regardless of the amount of care utilized by the manufacturer."

In the instant case, the facts show that plaintiff was concerned for her safety and bought a burglar alarm system for her home from defendant. Pursuant to the recommendation of defendant's sales representative, she also purchased a remote control panic sender device. When the events which she feared might happen occurred on the evening of November 18, 1971, the alarm system failed to function even though plaintiff claims she "was pressing this thing [transmitter button] for dear life".

Testimony at trial from defendant's salesman and the third-party defendant's expert disclosed that several things could have happened to the transmitter to cause it to fail. It may have been out of frequency, the button may have jammed, or it may have been interfered with by a stray radio

signal or blocked by some barrier. In any event, we do know that one of defendant's service employees made at least one call to plaintiff's residence because of a false alarm subsequent to the installation of the system, but prior to November 18, 1971. We also know that the transmitter was tested twice at plaintiff's home a few days after the attack, and while plaintiff was in the hospital, but it did not work, that replacement batteries did not correct the problem at either test, that the device was repaired on December 2, 1971, and the push button was replaced, that the repair invoice indicated a frequency adjustment and a component failure, that the transmitter was not returned to plaintiff and defendant does not know where it is, and that defendant replaced plaintiff's transmitter and receiver with a different brand.

In view of these facts, I cannot say it would be unreasonable for a jury to infer that the transmitter failure was probably due to a defect attributable to the defendant. Questions of comparative probability are to be resolved by the trier of fact, *Holloway II, supra,* 622. Therefore, the case was properly submitted to the jury.

This was a hard fought case with numerous objections. The trial judge did an admirable job in trying to keep the case clear in the minds of the jurors. And, if the instructions to the jury were correct, I would have no difficulty affirming the verdict. However, the instruction on one crucial aspect of the case was not correct. While the judge properly instructed the jury on most matters, he also submitted special questions to the jury, one of which asked:

"2. Was the Multi-Elmac transmitter defective at the time if *[sic]* left the hands of:
(a) the manufacturer, Multi-Elmac?

(b) the seller, Michigan Security Systems?

(c) *If the answer to (a) or (b) above is yes, what was the defect?"* (Emphasis added.)

Plaintiff objected to question 2(c) because "It's our position, Your Honor, that in our case we don't have to show a specific demonstrable defect". Plaintiff's objection was noted but overruled. Despite the special questions, the jury returned a general verdict of no cause of action[3] and its answers to the special questions do not appear in the record. Accordingly, it is not possible to determine the basis of the jury's verdict. The jury may have concluded that plaintiff had no cause of action due to question 2(c).[4]

Question 2(c) called for a specific identification of the problem with the transmitter. This was error. The question likely left the jury with the incorrect notion that plaintiff was required to pinpoint the defect or lose her case. But, as previously stated, plaintiff was not required to prove a particular malfunction. She sustained her burden of showing a defect attributable to the defendant if she established by direct or circumstantial evidence a reasonable probability that the defect, whatever it might be, was attributable to the defendant. *Holloway II, supra,* 618, 621, 626-629, *Snider, supra,* 713-716.

The evidence suggested a number of conceivable

---

[3] The procedure used here was agreed to by the parties and is not an issue on appeal. For these reasons, I decline comment on the propriety of the procedure. See generally, GCR 1963, 514; 6 Callaghan's Michigan Pleading & Practice (2d ed) § 39.01, p 313.

[4] There are, of course, numerous other possibilities. The jury may have disbelieved plaintiff when she said she pushed the button. Or the jury may have found no causal connection between the product malfunction and plaintiff's injuries. Either of these determinations could have been legitimate. However, the record in this case does not permit me to conclude that the jury did not base its decision on the misleading question.

loci for the alleged defect in the transmitter: the push button, the batteries, a tendency to wander from frequency specifications, or excessive susceptibility to interference. Plaintiff never sought to pinpoint the nature of the defect in design or assembly, but that was not her task. Rather, plaintiff relied on the pre-attack false alarm, the November 18, 1971, malfunction itself, and the post-malfunction repairs and replacements to support a reasonable inference that the transmitter was somehow defective.

It is certainly true that plaintiff's case amounts to a collection of discrete suggestions that the transmitter was faulty in one or more respects. But, taken together, plaintiff's evidence allows the inference that *some* defect was present when the transmitter left defendant's hands. Whether that inference is the most probable inference was a question to be given to the trier of fact under proper instructions. Special question 2(c) was not a proper instruction. Therefore, I would reverse the verdict and remand the case for a new trial.